## NORWINE COFFEE CO. v. CHASE & SANBORN.

### Patent Appeal No. 2964.

Court of Customs and Patent Appeals.
May 23, 1932.

Titian W. Johnson, of Washington, D. C., for appellant.

Louis H. Harriman, of Boston, Mass., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This is a trade-mark interference proceeding in which the Commissioner of Patents, reversing the Examiner of Interferences, awarded to Chase & Sanborn priority and right to register the notation "Dining Car" as a trade-mark for coffee.

The application of Norwine Coffee Company for registration of the words as a trademark for tea, coffee, cocoa, food flavoring extracts, and spices was filed May 7, 1928. In said application it was stated that appellant was the owner of trade-mark No. 99,217 registered, for use on coffee only, by the Johnson-Layne Coffee Company (a predecessor in business) August 25, 1914, upon an application filed July 5, 1913; same being the notation "Dining Car." Use of the mark by appellant and its predecessor in business was alleged from about December 10, 1908.

Chase & Sanborn's application was filed December 11, 1928, use of the mark being alleged "since Oct. 18, 1905."

The Examiner of Trade-Mark Interferences reached the conclusion from the record in the case that the use of the mark by Chase & Sanborn was a grade mark use intended to denote quality, or distinguish the blend, rather than a trade-mark use intended to denote origin, and so, notwithstanding the earlier use by Chase & Sanborn, priority and right to register was awarded Norwine Coffee Company. Upon appeal the Commissioner of Patents, taking a different view, reversed the decision of the examiner, and appeal to this court was taken.

The vital issue in this case is one which has not heretofore been before this particular court for adjudication. The question presented is whether, under the facts shown, the firm of Chase & Sanborn, the junior party in interference, has established that its use of the words between October 18, 1905, the date when it claims to have begun use of same, and December 10, 1908, the date fixed by appellant as the beginning of the use of them by one of its predecessors in business, was in a legal sense a trade-mark use.

Chase & Sanborn did make use of the words "Dining Car Special Coffee" upon coffee within that period. The fact of such use is not in serious question, but whether the particular use was a trade-mark use is disputed by appellant.

We are not confronted with any issue as to the Norwine Coffee Company being entitled to the date claimed by it, nor as to the use by it having been a trade-mark use.

These facts are conceded by appellee, and the record conclusively shows that said company and its predecessors in business continuously exploited the mark, advertising the particular coffee so branded extensively, and building up a large distributing business extending into more than ten states. The mark was registered, for use upon coffee only, in 1914 by appellant's predecessor, the Johnson-Layne Coffee Company. Appellant is domiciled in St. Louis, Mo.

The firm of Chase & Sanborn prior to July 1, 1929, when it was incorporated, was a partnership composed of six members. It was domiciled in the city of Boston, Mass., but had a branch business in the city of Chicago, Ill., from about 1892. The firm is an old one and is well known. The activities out of which this issue grew all originated with the Chicago branch of the appellee firm. The coffee bearing the disputed brand was handled from that branch and the "Dining Car Special Coffee" notation seems not to have been even known to the principal office in the city of Boston until during the year 1925. The application for registration seems to have been filed by a Boston member of the firm, but most of the testimony in the case comes from persons living in Chicago and connected with the Chicago branch.

Our immediate concern is with the use by said Chase & Sanborn during the limited period from October 18, 1905, to December 10, 1908. For the purposes of this case that may be referred to as the critical period.

The only sales of coffee positively shown by the record to have been made by Chase & Sanborn, bearing the brand "Dining Car Special Coffee," during said period were sales to two railroad companies—the Louisville & Nashville and the Pennsylvania—for use upon the dining cars operated by said companies. There seems to have been something in the nature of a standing order from these companies for the particular blend of coffee which was so branded, and evidently large quantities have been shipped to them by appellees during the many years that the contract has been in force.

During the period which is critical in this case, the coffee was shipped to said railroad companies in cans of different sizes and sometimes perhaps in 25-pound bags, printed labels bearing the words, "Dining Car Special Coffee," being pasted upon the containers.

It is also in evidence that during said period the Chicago branch had the words printed upon paper bags of different sizes, such as

8-ounce and 1-pound bags, and it is insisted in argument that the coffee sold in these paper bags was sold to others than the railroad companies. Of this latter fact, however, there is no clear and positive proof.

Two or three of the witnesses for Chase & Sanborn, testifying in 1929, wholly from recollection, stated that sales had been made to grocers and the trade generally at various times; but nowhere in the record is there identification of a single sale by Chase & Sanborn to any person, dealer, wholesaler, company, or concern of any kind, other than the two railroads, of any coffee marked "Dining Car" or "Dining Car Special Coffee," prior to the year 1925, when the main office at Boston seems for the first time to have noticed the notation and began to make sales in containers so marked.

It may also be remarked that there is no positive testimony that the paper bags were not utilized in the shipments of coffee to the railroad companies. We are simply asked to infer that they were not so used but were used to contain that sold to others.

Even if we were at liberty to make such an inference and treat it as a proven fact, there is not a word of evidence to indicate that during the critical period the sales in the paper bags were interstate commerce transactions and that, too, would have to be inferred.

We are asked to infer too much.

The rights of Chase & Sanborn must rest upon the transactions with the railroad companies during the critical period, and the facts and circumstances connected therewith.

It is in evidence that "Seal Brand" is the principal trade-mark of Chase & Sanborn. It is also in evidence that the coffee which they sold to the railroad companies was a special blend prepared, probably secretly, in their establishment for that particular and special trade. They prepared other specials which seem to have been also branded with appropriate designations. One of their witnesses who began work in the Chicago establishment in 1902 says: "We had a great many specials—Hotel Special and Cafe Special, Special this, that and the other, and every customer *knew his own Special.*" (Italics ours.) The witness added that, when they billed the coffee to their respective customers, " * * * it was our custom to bill them just as Special."

Under this state of facts, our views upon this controversy coincide with those of the Examiner of Trade-Mark Interferences, rather than with those of the Assistant Commissioner of Patents.

The course of conduct pursued by the representatives of the appellee firm, as shown by the record, relative to the use of the words "Dining Car Special Coffee" upon the particular coffee sold and shipped in the manner heretofore stated, during the critical period, leads us to conclude that it was never intended at that time to make a trade-mark use of the words. They were used, in our opinion, largely for purposes of convenience in identification, and merely to distinguish that particular blend from other special blends, which the firm was producing for different classes of customers. They were not used to denote origin. There was not, during that period, any exploitation by advertisement or otherwise of that blend of coffee to the trade. The use did not amount to what the law recognizes as a trade-mark use.

While, as has been stated, this court has not had occasion heretofore to pass upon the issue here involved, other courts have spoken upon the subject.

In Kohler Mfg. Co. v. Beeshore, 59 F. 572, 576, 67 O. G. 678, 1894 C. D. 277, the Circuit Court of Appeals of the United States for the Eastern District of Pennsylvania, citing Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526, said: "Nor will a court of equity recognize by injunction a proprietary right in a phrase or name, unless it has been used in such circumstances, as to publicity and length of use, as to show an intention to adopt it as a trade-mark for a specific article."

A case which seems to be quite in point was determined by the Court of Appeals of the District of Columbia, our immediate predecessor in this jurisdiction, February 5, 1923; the same being Touraine Co. v. Washburn & Co., 52 App. D. C. 356, 286 F. 1020, 1022.

The facts in that case, as stated by the court, were that Washburn & Co. were shown to have used the word "Touraine" as a mark upon one particular mixture (out of some 200 mixtures) of candy, its use having begun in 1897 and continued through the years until a controversy arose in which said company opposed the registration of said mark by Touraine Company, who had acquired it from a predecessor in 1907 and used it as a trade-mark for all its candy and confection products. From the testimony in that case the court concluded and held that the use of the mark (it being used in connection with "chocolate mixture") was a grade mark use, say-

ing: "It was used by the opposer to indicate the character of the chocolate, not the origin of it. The distinction between a technical trade-mark and a device to denote style or quality is pointed out in Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 546, 11 S. Ct. 396, 34 L. Ed. 997; and Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 S. Ct. 151, 37 L. Ed. 1144. * * *"

The decision of the Commissioner of Patents is reversed, and priority and right of registration are awarded to appellant.

Reversed.